# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

Brooks, Appellant, *v.* Philadelphia & Reading Railway Company.

218      1
36 SC ²583

*Negligence—Railroads—Passenger—Carrying passenger beyond station
—Alighting from train—Nonsuit.*

The contract of a passenger with a railroad company, as evidenced by his ticket, requires the company to carry him safely to his destination and to give him an opportunity to alight at the usual stopping place. It is the duty of the carrier to announce the name of the station as the train approaches it, and on the arrival of the train at the station to afford the passenger sufficient time and opportunity to alight in safety. The passenger's contract does not terminate until he has alighted from the cars. At the end of the journey the relation of the carrier and passenger continues until the passenger has had a reasonable opportunity to depart from the train or car in safety.

In an action against a railroad company by a passenger, to recover damages for personal injuries, it appeared that the plaintiff was a woman sixty-five years old. The train did not stop at the station of her destination, and as it was passing, she stepped to the door of the car in which she was riding, and told the brakeman that she desired to alight at that station. As she was talking with the brakeman, the conductor came running through the car and said that he had forgotten to notify the brakeman to stop the train at the station, and that the train would then stop which it did, about 100 yards beyond the station. It was dark, and plaintiff told the conductor and brakeman that she preferred being let off at the platform, but the brakeman said that he would assist her to alight there. Plaintiff testified that when she attempted to alight, she had to lean over to put her hands on the brakeman's shoulder to get down, and that she had to jump four and one-half

feet. She said that "in some manner my left limb twisted and caused a rupture for which I have suffered ever since." The trial judge entered a nonsuit because there was no evidence to show how plaintiff "twisted herself, or what caused her to twist herself." *Held,* to be error.

Argued March 27, 1907. Appeal, No. 378, Jan. T., 1906, by plaintiffs, from order of C. P. No. 1, Phila. Co., March T., 1904, No. 4,136, refusing to take off nonsuit in case of Edward Brooks, Jr., Administrator of the Estate of George W. Hamilton, and Clara Amelia Hamilton, his wife, v. Philadelphia & Reading Railway Company. Before MITCHELL, C. J., FELL, MESTREZAT, POTTER and STEWART JJ. Reversed.

Trespass to recover damages for personal injuries. Before BEITLER, J.

The facts are stated in the opinion of the Supreme Court.

*Error assigned* was refusal to take off nonsuit.

*Edward Brooks, Jr.,* with him *Frederick J. Geiger* and *Edgar Dudley Faries,* for appellant.—The case was for the jury : Englehaupt v. Erie R. R. Co., 209 Pa. 192 ; Case v. D., L. & W. R. R. Co., 191 Pa. 450 ; Phila. & Reading R. R. Co. v. Edelstein, 23 W. N. C. 342 ; Hartzig v. Lehigh Valley R. R. Co., 154 Pa. 364 ; Moulton v. Sanford, 51 Me. 127 ; Goodlander Mill Co. v. Standard Oil Co., 63 Fed. Repr. 400 ; Ry. Co. v. Kellogg, 94 U. S. 469.

*Gavin W. Hart,* for appellee, cited : Deery v. R. R. Co., 163 Pa. 403 ; R. R. Co. v. Napheys, 90 Pa. 135 ; Rothchild v. R. R. Co., 163 Pa. 49.

OPINION BY MR. JUSTICE MESTREZAT, April 22, 1907 :

On January 1, 1903, Clara Amelia Hamilton, one of the plaintiffs, was a passenger on the defendant company's train leaving the Reading terminal in the city of Philadelphia about 6 o'clock in the evening. Her destination was Lafayette station at which the train was due about 6 : 30 that evening. After the train left the station, the plaintiff surrendered her ticket to the conductor. The train did not stop at Lafayette station, and as it was passing, the plaintiff stepped to the door

of the coach in which she was riding and told the brake-
man that she desired to alight at that station. He replied
that the train had not yet arrived at the station, which she
insisted was not true. While they were talking, the conduc-
tor came running through the car and said that he had for-
gotten to notify the brakeman to stop the train at Lafayette
station, and that the train would then stop which it did,
about 100 yards beyond Lafayette station. It was then
dark and plaintiff told the conductor and brakeman that she
preferred being let off at the platform, but the brakeman said
he would assist her to alight there. She then attempted to
alight from the train and testified that " when getting down
in some manner my left limb twisted and caused a rupture for
which I have suffered ever since."

At the time of the accident, Mrs. Hamilton was sixty-five
years of age, and was a large woman. The brakeman was a
tall, stout man and stood on the ground and assisted Mrs.
Hamilton to alight. In her testimony she describes the man-
ner in which she left the coach as follows : " Well his (brake-
man's) head I suppose was on a level with my knee about,
and I had to lean over this way and put my hands on his
shoulder to get down. It was all of four feet that I had to
jump, four feet and one-half."

This action was brought to recover damages for the injuries
sustained by Mrs. Hamilton by reason of the alleged neg-
ligence of the defendant company. The plaintiff alleges that
the servants of the carrier company were negligent in not
stopping the train and permitting her to alight at Lafayette
station, her destination, and in causing the train to stop be-
yond the station and compelling her to alight at an improper
and unsafe place, and that her injuries were the direct result
of such negligence. At the conclusion of the plaintiff's testi-
mony the learned trial judge, on motion of defendant's
counsel, entered a nonsuit ; and the reason therefor was stated
as follows : " I will enter a nonsuit in this case. The plain-
tiff says in getting down she twisted herself somehow. There
is no evidence whatever as to how she twisted herself or what
caused her to twist herself."

The contract of a passenger with a railroad company, as
evidenced by his ticket, requires the company to carry him

safely to his destination and to give him an opportunity to alight at the usual stopping place.  It is the duty of the carrier to announce the name of the station as the train approaches it, and on the arrival of the train at the station to afford the passenger sufficient time and opportunity to alight in safety.  The passenger's contract does not terminate until he has alighted from the cars : St. Louis, etc., Ry. Co. v. Finley, 79 Tex. 85.  At the end of the journey the relation of the carrier and passenger continues until the passenger has had a reasonable opportunity to depart from the train or car in safety : 6 Cyclopedia of Law and Procedure, 541.  In the very recent (third) edition of Hutchinson on Carriers, sec. 1122, the duty of railway carriers of passengers is defined as follows : " As has already been shown, railway carriers of passengers must provide safe platforms and other necessary facilities for access to and for alighting and egress from their trains by their passengers, and their duty in this regard has been indicated, as far as it can be done, from the adjudicated cases. Having provided such platforms, they are required to be careful to bring their coaches up to them in such manner that their passengers may be afforded the opportunity safely to alight upon them ; and if the passenger be called upon to leave the coach before this has been done, or if he is reasonably induced to believe, from the circumstances or from the conduct of those in management of the train, that it has been halted in order that the passenger may there alight, and that no other or better opportunity will be given him to do so, and in undertaking to leave the conveyance, with due care and discretion, he receives an injury from the want of the proper facilities for doing so, or by reason of the dangerous character of the ground, the carrier will be held responsible for its negligence." And in a subsequent section, 1126, it is said : " Carriers must be equally careful not to pass beyond the alighting platform or station, and thus to require or make it necessary for the passenger to alight without returning to it."  In Englehaupt v. Erie Railroad Co., 209 Pa. 182, it is said : " It is the duty of a carrier not only to exercise the strictest vigilance in receiving and conveying a passenger to his destination, but also to set him down safely at a station at the termination of his journey."   And in Case v. Delaware, Lackawanna &

Western Railroad Co., 191 Pa. 450, where, as here, the train passed the station and the plaintiff alighted some distance beyond the platform, Chief Justice STERRETT, in reversing a judgment for the carrier company, said (p. 456) : " The duties of common carriers of passengers, under circumstances such as the evidence in this case tends to establish, are too plain to require either comment or citation of authorities. If the failure of the defendant to perform its duty to the plaintiff as a passenger, was the proximate cause of the undoubtedly serious injury which she sustained in attempting to reach the station platform, she is entitled to recover adequate compensation in damages, unless she was guilty of negligence which contributed to her injuries."

From these authorities defining the duty of a railway carrier towards its passengers, it clearly appears that it was the duty of the defendant company, under its contract with Mrs. Hamilton, not only to carry her from Philadelphia to Lafayette station, but to announce the name of the station as the train approached, and to stop at the station and give her sufficient time and opportunity to alight in safety. Having failed to perform this well-defined duty, the carrier was guilty of negligence and responsible for any injury which proximately resulted from that failure of duty. This was a nonsuit in the court below and the plaintiff is entitled to have the facts, as shown by her testimony, taken as verity together with all the reasonable inferences to be drawn therefrom. The station was not announced as the train approached, nor did the train stop at the station, the reason, presumably, being that the conductor, as he said, had forgotten to direct the brakeman to stop it. The plaintiff did not request to be let off at the place where the train stopped ; on the contrary, she suggested to the conductor and the brakeman that she preferred to be put off at the platform. To this the brakeman said that he would assist her to alight at that place. Leaving the coach at the place where the train stopped, therefore, was not her voluntary act, but was done after at least an implied request and a refusal by the company's servants to return the train to the station. So far as the evidence discloses, this was her only opportunity for alighting from the train so as to reach her destination. The train was halted there for the express purpose of permitting her to alight, and

her attempt to do so, under the circumstances disclosed by the uncontradicted testimony, involves no wrong or want of care on her part.

We are told, however, by the learned trial judge, that a recovery cannot be permitted because she has not shown "how she twisted herself or what caused her to twist herself." In the language of Mr. Justice Strong in Milwaukee, etc., Ry. Co. v. Kellogg, 94 U. S. 469, "such refinements are too minute for rules of social conduct." The plaintiff has described the succession of events from the time of the carrier's negligent act in carrying her beyond the station until she was injured in alighting from the train. She described minutely, as will be observed, how and where she left the coach and how she was injured in doing so. There was sufficient evidence to warrant the jury in finding that the place the carrier's servants required her to alight was unsafe and dangerous. There was no platform or other appliances there to enable a passenger to alight safely. She placed her hands upon the shoulders of the brakeman and then stepped or jumped to the ground, which was a distance of from four to four and one-half feet. This act, it is shown, resulted in her serious injury, described by the physician as inguinal rupture. The physician testified that "anything that produced an extraordinary strain on the contents of the abdomen or weakens the walls of it or distends it will produce rupture;" and that her condition could undoubtedly have been produced by such an accident as she described on the witness stand. The twist of the limb occurred while she was alighting from the train, and if that caused the rupture, then the fact that the limb was twisted was sufficient without any further description of how it was done. It is not alleged that she did not use care in stepping from the car, or that her limb was twisted by the failure to observe care in the act of stepping from the coach. She says "when getting down, in some manner my limb twisted and caused a rupture." We think this was sufficient, in view of the fact that she detailed the manner of her leaving the coach. Common experience teaches that, under such circumstances, it is often difficult to describe in greater detail what produced the results of the accident. In this case the testimony, if believed, shows that the accident to the plaintiff, caused by being required to alight

from the train at an improper place, resulted in rupture, and we think the learned court was clearly in error in requiring, as a condition precedent to a recovery, a minute description of each move and twist of the plaintiff's body resulting in her injury.

The assignments of error are sustained, and the judgment is reversed and a procedendo is awarded.