## New Domain Oil & Gas Company v. McKinney, et al.

(Decided February 13, 1920.)

### Appeal from Estill Circuit Court.

1. Infants—Avoidance.—A deed executed by an infant is not void 'but voidable, and it may be disaffirmed at any time after its execution by a proper proceeding for that purpose instituted in the name of the infant by his statutory guardian; and when disaffirmed, either by a court proceeding or by the infant himself after he shall have arrived at the age of twenty-one, the restored title of the infant relates back to the date of his deed.

2. Infants—Estoppel.—An estoppel does not operate against an infant except to prevent him from taking advantage of his own fraud, perpetrated by misrepresentation as to his age, made under circumstances calculated to deceive one of ordinary prudence, and who is deceived thereby.

3. Contracts—Capacity to Execute Contract Governed by Law of Place.—The capacity of one to execute a contract affecting the title to real estate is governed by the law of the place where the real estate is situated, and not by the law of the place where the contract is executed.

4. Tenancy in Common—Sale or Lease by Cotenant.—One cotenant may not sell or lease the entire property and thereby bind his cotenant, without authority to do so, but such deed or lease may be given the effect of transferring the title of the conveying tenant and of making his vendee or lessee a cotenant with those not parties to the contract.

5. Tenancy in Common—Occupancy—Liability—Measure of Recovery.—One cotenant has the right to occupy the entire joint property, but if he excludes his other joint owners, he is liable to account to them for the rents and profits arising from the use of the property, and where he appropriates a part of the property itself he is liable to an accounting, at the instance of his cotenant, for the value of their proportionate part of the property appropriated by him; and where the property so appropriated is a fugacious mineral like oil, and defendant is able and willing to extract it, and his cotenants are not, the measure of recovery should be the value of the oil produced, less the cost of extraction and marketing, including overhead or fixed expenses; but this rule

will not apply where the operating tenant was guilty of no wrong and conducted his operations under the bona fide belief that he was the sole owner of the land which he mined, in which case he would be liable to his cotenants for only the usual and customary royalties prevailing in that community as rentals for like operations.

6. Tenancy in Common—Action by Cotenant for Accounting.—When a cotenant sues for an accounting in such cases, and has been made to account for his portion of the expenses under the above rule, he becomes a joint owner in the equipment of the mine to the extent of his interest in the land upon which the mining business is being conducted.

7. Landlord and Tenant—Warranty of Title.—In a lease for a term of years, wherein the lessor "granted, demised, leased and let" certain premises, there arises an implied warranty of title in the lessor, and also one for quiet enjoyment by the lessee, unless by the terms of the lease a contrary intention appears.

8. Covenants—Breach of Covenant—Measure of Damages.—The measure of damages upon a breach of covenant of title, or a breach of one for quiet enjoyment, is the value of the consideration agreed to be paid at the time of the execution of the instrument containing the covenant, and if there is a pro tanto eviction, there will be a corresponding pro tanto recovery, unless the value of the part lost to the covenantee by the pro tanto eviction is of greater value than the interest of plaintiff in the eviction suit, in which case the recovery in a suit for breach of covenant will be the value of the part lost, not to exceed the entire consideration paid to the warrantor.

9. Landlord and Tenant—Eviction—Accounting for Oil.—The lessor leased premises for mining operations for oil, in which lease the lessee agreed to pay the lessor one-eighth of the gross amount of the oil produced. The lessee was evicted to the extent of a one-seventh interest by the owner of a paramount title, and was compelled to account to such owner for one-seventh of the amount of the oil produced. Held, that in a suit against the lessor on his implied warranty under the lease, plaintiff was entitled to recover the net value of the one-seventh of the oil adjudged to be paid to his evictor, not to exceed the value of one-eighth of the gross amount of oil produced and agreed to be paid to the lessor.

BYRD & VAUGHN for appellant.

BEVERLY R. JOUETT and CLARENCE MILLER for appellee, Mattie L. McKinney.

HUGH RIDDELL for appellee, Jesse F. McKinney.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing:

The uncontradicted facts in this case are: Appellee and plaintiff below, Mattie L. Stacy (nee McKinney),

was on August 28, 1915, just past eighteen years of age and living with her mother and sisters at Dayton, Ohio, to which place she and her mother had moved from Estill county, Kentucky, some years before, shortly after the death of her father. Appellee was born and reared on the tract of land in controversy in this suit. which consisted of about two hundred acres, lying in Estill county. On the day above mentioned she, her mother and her sisters, executed to appellee and plaintiff below, Jesse F. McKinney, her brother, a deed to the tract of land in Estill county inherited from their father, Richard Mc-Kinney, by which they each conveyed to him their supposed one-seventh undivided interest therein.

On October 20, 1915, J. F. McKinney executed a lease to the appellant and plaintiff below, the New Domain Oil & Gas Company (hereinafter referred to as the oil company), by which, in consideration of $400.00 cash in hand paid to him by the oil company, and the agreement by it to deliver to him one-eighth of all the oil produced on the land, he conveyed to it the privilege of extracting all the oil under the land, and soon thereafter the oil company began operations under its lease, and when this suit was filed on November 9, 1916, it had drilled about twenty-five producing wells thereon.

After the execution of her deed to her brother, J. F. McKinney, the plaintiff married one Stacy, and by her statutory guardian she brought this suit against the oil company and her brother, seeking against the latter a cancellation of the deed which she executed to him for her one-seventh interest in the land, and an accounting against the oil company for one-seventh of all the oil which it had taken from the land, and for a like quantity of the oil which it might take therefrom in the future. She prayed for other ancillary relief, such as an injunction, the appointment of a receiver, etc., none of which is material to the disposition of this case. She bottomed her right to the relief which she sought upon the fact that at the time she executed the deed to her brother she was an infant under the age of twenty-one years, and with her petition she tendered to him the note for $75.00 which he had executed to her in consideration of the conveyance. The brother seems to have conceded the right of plaintiff to the relief, for soon after filing the suit he and his wife executed a deed to plaintiff, reconveying to her a one-seventh interest in the land.

The first paragraph of the answer of the oil company was a denial of the allegations of the petition. The second paragraph alleged the good faith of the oil company in its development of the lease, under the belief that it was the sole owner thereof. The third paragraph alleged that plaintiff was a citizen and resident of the state of Ohio at the time she executed the deed to her brother, and that under the statutory law of that state a female is *sui juris* after the age of eighteen years, and that plaintiff was above that age at the time of making the deed and she was therefore not entitled to disaffirm it, although the land covered by the deed was situated in Kentucky, and by the statutory law of this state she would not be *sui juris* until she arrived at the age of twenty-one years. The fourth paragraph relied upon an estoppel by conduct, in that it was alleged that plaintiff, after the execution of the deed, knew of the drilling operations by the oil company and made no objection or protest, nor did she reveal to it any purpose to disaffirm her deed. The fifth paragraph was a contention that plaintiff, if all her rights in the premises be conceded, could not disaffirm her deed until she became twenty-one years of age. The sixth paragraph denied the right of plaintiff to an accounting further than to receive her proportionate part of the oil agreed to be paid as a royalty to defendant's lessor, J. F. McKinney; i. e., a one-seventh of one-eighth of the oil produced. The seventh paragraph as amended was a cross-petition against J. F. McKinney seeking a recovery against him for whatever sum plaintiff obtained (a) because of fraud practiced by him in executing the lease whereby he transferred to the oil company the entire interest in the leased premises, knowing that he owned only six-sevenths interest, and because (b) his lease contained an implied warranty of title, as well as one for quiet enjoyment, which would be broken if plaintiff succeeded in her suit.

The court sustained the demurrer filed by plaintiff to the third, fifth and sixth paragraphs of the answer, and overruled her demurrer to the second and fourth paragraphs thereof. However, in the preparation of the case proof was taken upon the issues made by all the paragraphs, and the court in its judgment seems to have determined them and disallowed what we might term the obstructive pleas contained in the answer, and upon the main question (that of accounting between plaintiff and

the oil company) adjudged that plaintiff was entitled to one-seventh of all of the oil obtained from the land both before and after the filing of the suit by plaintiff, less expenses incurred in obtaining it, including fixed or overhead expenses, but denied the right of the oil company to deduct one-seventh of the expenses after November 1, 1917 (being the date when plaintiff was ordered to turn over one-seventh of the gross oil produced to a trustee, subject to be disposed of by the future orders of the court), unless plaintiff or her representative be thereafter permitted to have a voice in the management of the oil producing operations on the leased land.

The court further gave judgment in favor of the oil company against J. F. McKinney for one-seventh of the $400.00 bonus paid to him, and for one-seventh of the one-eighth of the oil delivered to him as royalty, and directed that the company in the future pay to him in satisfaction of his royalty six-sevenths of the one-eighth of the oil agreed to be paid to him, and from that judgment the oil company prosecutes this appeal. There was also an appeal prayed by and granted to both plaintiff, and J. F. McKinney, neither of whom has taken any steps in this court to complete it.

In disposing of the case we will consider only such questions as we deem material, the first of which is, whether the legal capacity of plaintiff to execute the deed to her brother is to be determined by the laws of the state of Ohio, where it was actually executed, or by the laws of the state of Kentucky, where the land conveyed thereunder lies. The general rule governing the validity of contracts is that the law of the place of performance of the contract applies and that in the absence of a showing to the contrary the place of performance will be presumed to be the place where the contract is made, and when made by one having a regular domicile, it will be presumed that the law of the place of his domicile shall govern the validity of the contract, as well as its construction, although he may have been temporarily absent from his domicile at the time the contract was executed. With reference to infants, their domicile is that of their parent having them in charge, and unless their domicile has been changed by such parent in some of the modes pointed out by the law, their once acquired domicile will continue, since the infant is incapable of changing its

domicile by its independent act or conduct. Munday v. Baldwin, 79 Ky. 121.

While the above general rules ordinarily apply in the case of contracts, there is a well established exception in cases where the property or thing to which the contract relates has a fixed situs, as is true of real estate. In that case all of the authorities, so far as we are aware (and no case to the contrary has been cited), hold that all matters concerning the title to and disposition of real estate are to be governed by the *lex loci rei sitae,* and not by the *lex loci contractus.* Thus in 5 R. C. L. 925, in stating the rule the text says:

"All real or immovable property is exclusively subject to the laws of the country within which it is situated, and no interference with it by any other sovereignty can be permitted. It therefore follows that all matters concerning the title and disposition of real property are determined by what is known as the *lex loci sitae,* which can alone prescribe the mode by which a title to it can pass from one person to another," &c. See, also, pages 952 and 953 same volume.

39 Cyc. 1182, states the rule thus: "The requisites and validity of a contract for the sale of land are governed by the law of the place where the land is situated."

As applicable to contracts executed by infants, the text in 14 R. C. L. 232, says: "If the question is one of the title of land, it (the legal capacity of the infant) will be determined by the law of the state where the land lies." Other cases and authorities in point are Story on Conflict of Law, section 424; Freeman v. Falconer, 201 Fed. R. 785; Thos. J. Baird Inv. Co. v. Harris, 209 Fed. 291, 61 L. R. A. 119; Breckinridge v. Moore, 3 B. Mon. 629, and Middleton's Trustee v. Middleton, 172 Ky. 826.

In the Breckinridge case, upon the point under consideration, this court said: "The transaction between complainant and Steele it is true took place in the state of Tennessee, but it was for the sale of a tract of land in the state of Kentucky. Does the *lex loci contractus,* or the *lex rei sitae* govern this contract? The rule is settled that real contracts, or contracts in relation to land, must be governed by the *lex rei sitae.*"

Defendant's counsel, in seeking to establish a contrary doctrine, rely upon the following authorities: Minor on Conflict of Laws, section 72; 22 Cyc. 512; Milliken v. Pratt, 125 Mass. 374; Scudder v. Union Na-

tional Bank, 91 U. S. 406; Harris v. Berry, 82 Ky. 137; Gibson v. Sublett, idem. 596; Love v. McCandless, 157 Ky. 352, and perhaps others, but none of them involve contracts relating to the conveyance of real estate. The one coming nearest thereto is that of Love v. McCandless, *supra,* which involved the right of a widow, who was under twenty-one years of age, to abandon her statutory homestead in lands situated in Kentucky by an attempted conveyance thereof made in the state of Illinois,. where she resided and under the laws of which she was *sui juris.* But when it is remembered that the homestead right involved therein is only a right of occupancy, and not an estate in land, it is at once apparent that the principles announced in that case will not apply to the facts involved here.

But independent of what has been said, the trial court held under the evidence that plaintiff had not, by any act or conduct on her part, or on the part of her mother with whom she was living, changed her legal domicile from Kentucky to Ohio, and we are not prepared to say that this part of the judgment was contrary to the evidence. It is therefore our conclusion that plaintiff, being an infant according to the laws of Kentucky, where her land was situated, was incapacitated to execute the deed, and it was voidable, subject to be disaffirmed upon appropriate steps taken by her or by one authorized to represent her.

·The next question is whether plaintiff's right to disaffirm her deed, or that of her statutory guardian in a proceeding of this character, is postponed until she attains her majority. Perhaps no one will dispute the proposition that an infant's deed is not void but voidable only, and if legally disaffirmed the title to the land conveyed is restored to the infant as though no deed had been made. It is made so by the law because of the conclusive presumption of incapacity of the infant to make it. Any disaffirmance (which necessarily would have to be by the execution of another deed) made by the infant alone before reaching his majority would be of the same voidable nature, and for that reason the courts generally hold that such attempted disaffirmances are not effectual for that purpose, and it is upon authorities so holding that plaintiff's counsel rely and cite in their brief. Even those authorities hold that the infant at any time after the execution of the deed and before attain-

ing his majority may make an entry upon the premises conveyed by his voidable deed and oust his vendee. But we have found no case going to the extent of holding that it was incompetent for the infant by his guardian (or perhaps next friend) to go into a court of equity and seek, through a proper proceeding brought for the purpose, a cancellation of his deed. On the contrary, the rule seems to be well established that an infant, by appropriate proceedings in court, may avoid his deed at any time. Harrod v. Myers, 76 Am. Dec. 409; Vallandingham v. Johnson, 85 Ky. 288; Bryant v. Pottinger, 6 Bush 473; Moore v. Baker, 92 Ky. 518; Dotson v. Dotson, 172 Ky. 641; International Land Company v. Marshall, 22 Okla. 693, 19 L. R. A. (N. S.) 1056, and 14 R. C. L. 235-237.

In the last authority referred to, the text, after stating the general rule as to the inability of the infant to disaffirm his deed by the execution of another, says: "He can, however, bring an action during his infancy to set aside the deed." On page 237, it is said: "In modern times the usual mode of disaffirming a deed made in infancy is by suit; either a suit in ejectment or the equivalent modern action for the recovery of title to land, or a direct suit in equity to set aside the deed."

In the latest case from this state cited (Dotson v. Dotson, *supra*), in deciding the identical question, this court said:

"She is now seeking in this action to recover by having her voidable deed set aside, the very thing which she could have maintained an action to recover at any time after the execution of her deed in January, 1872. . . . That the right of the plaintiff to bring this action accrued immediately upon execution of the deed in 1872, we have no doubt."

The court properly held, therefore, that the disaffirmance of plaintiff's deed to her brother was not prematurely attempted.

Neither are we convinced that plaintiff is estopped to either cancel her deed or to ask for an accounting by the oil company. This court has perhaps gone as far as any other in applying the doctrine of estoppel to infants, and in the cases of Ingram v. Ison, 26 Ky. Law Rep. 48; County Board of Education v. Hensley, 147 Ky. 441; Smith v. Cole, 148 Ky. 138; Turner v. Stewart, 149 Ky. 15, and Adkins v. Adkins, 183 Ky. 662, it was held that

any acts of the infant in the way of misrepresentations as to his age, whereby he was permitted to practice fraud upon an innocent party would estop him from afterward asserting his true age to the detriment of the party so fraudulently deceived. But even this rule has been applied by this court only to cases where the conditions, appearances and surroundings of the infant were such as to deceive one, dealing with him, as to his age. It would not apply to a representation, although fraudulently made, by an infant of such tender years as that no one could be deceived thereby.

Courts and text writers generally, if not universally, apply the same rules with reference to estoppel to the disabilities of coverture that are applied to the disabilities of infancy, and this court in the case of Venters v. Potter, 184 Ky. 447, said:

"Indeed it is a rule of almost universal application that with respect to real property a married woman will not be estopped by her silence and failure to assert her rights. 10 R. C. L. 747; Williamson v. Jones, 43 W. Va. 562, 64 Amer. St. Reports, 891, 38 L. R. A. 694."

It would be illogical to hold that an infant by his silence (which is non-action) could indirectly validate his deed when he could not directly do so by his active conduct in executing it.

But, aside from the legal phase of the case, the court no doubt held that the testimony did not furnish grounds for the estoppel contended for. For the oil company to have any semblance of right to interpose an estoppel, even if plaintiff was an adult, she must have known all of the facts, i. e., that her brother had leased the entire tract of land to the oil company, and that in doing so he ignored any rights which she might have had therein, and she must have been cognizant of its expenditures, and knowing such facts, acted in such a way as to create the belief on the part of the oil company that she had no actual or potential interest in the leased premises and that she did not intend to assert any. The testimony discloses no such facts, and we have no hesitancy in concluding that the estoppel relied on by the oil company is not available as a defense.

Before discussing the main question between plaintiff and the oil company—which is the proper method of accounting—we deem it proper to observe that plaintiff and her brother, the lessor of the oil company, were co-

tenants in the leased land, and consequently cotenants in everything constituting a part of it, including the oil thereunder; and one joint tenant can not sell the entire property and thereby divest his cotenant of title to his proportionate part. The only effect of such a sale by a joint tenant is to constitute his vendee a cotenant with the other joint owners. Kansas City Southern Railway v. Sandlin, 158 S. W. (Mo.) 857; Ziegler v. Brumeman, 237 Illinois 15; 2 Amer. & Eng. Ency. of Law, page 1090; White on Mines & Mining Remedies, sec. 24; Johnson v. O'Rorke, 98 N. W. R. 1068; Freeman's Cotenancy Partition, secs. 205, 273 and 311; Nevels v. Kentucky Lumber Co., 22 Ky. Law Rep. 247; Burt & Brabb Lumber Co. v. Clay City Lumber Co., 23 Ky. Law Rep. 1019, and Ballentine v. Joplin, 105 Ky. 70.

So that after the execution of the lease by J. F. McKinney to the oil company, it became a cotenant with plaintiff in the ownership of all of the oil under the land leased in proportion to the respective interests of the parties; i. e., the oil company owned six-sevenths undivided interest in the oil, and plaintiff one-seventh interest therein.

This brings us to a consideration of the vital question of the proper method of accounting between plaintiff and the oil company under the facts disclosed by the record. Our reading of the briefs of counsel convinces us that there is but little difference between them as to the law upon this point. They agree that one cotenant who alone occupies and operates the joint property is not a trespasser in the full sense of the term, since his undivided ownership entitles him to possession of the entire property, but the cotenant in possession is amenable under the law to his associates in title for their share of the rents and profits of the joint property, and if such profits arise from the mere use of the premises for the purpose for which it is intended—agricultural purposes, for instance—the non-occupying tenant would be entitled to recover his proportionate share of the reasonable rental value of the property.

However, a different rule prevails where the occupying cotenant appropriates to his own use a part of the joint property, as in the case of the extraction of minerals. The right of one cotenant to himself occupy and operate the joint property also prevails in the case of a joint ownership in minerals. Thornton's Law of Oil &

Gas, section 312. In such case if the occupying tenant, acting in good faith, believed that he had exclusive title to the joint property, he will be liable to account to his cotenant for the value in *situ* of his portion of the property converted, which also seems to be the rule applicable to an innocent trespasser. 18 R. C. L., pages 1196 and 1255, 27 Cyc. 639; Johnson v. Kansas Natural Gas Co., 135 Pac. Rc. 589, 90 Kas. 565; Bimell v. Boyd, 101 N. E. R. 657, 53 Ind. Appl. Rep. 310; Abbey v. Wheeler, 62 N. E. R. 1074, 71 N. Y. App. 650; Gulf Red Cedar Co. v. Grenshaw, 65 So. Rep. (Ala) 1010; Sanders v. Robertson, 57 Ala. 471; Freeman's Cotenancy Partition, sections 249, 249a, 259, 307, 309; Kahn v. Central Mowhead Mining & Milling Co., 145 Pac. R. 686; Liberty Bell Gold Mining Co. v. Smuggler, 203 Fed. Rep. 795; Gladys City Oil, Gas & Mfg. Co. v. Right of Way Oil Company, 137 S. W. R. (Texas) 171; Bender v. Brooks, 127 S. W. R. (Texas) 168; Thornton's Law of Oil & Gas, sections 313-316; Wooden Ware Co. v. U. S., 106 U. S. 432; Williamson v. Jones, 39 W. Va. 231, 38 L. R. A. 694; Austin v. Huntsville Coal Mining Co., 72 Mo. 535; Crawford v. Forest Oil Co., 218 Pa. 5; Stockbridge Iron Co. v. Cone Iron Works, 102 Mass. 80; McIntosh v. Ropp, 233 Pa. 497.; Findley v. Warren, 248 Pa. St. 315.

As to the method of arriving at the value of plaintiff's portion of the extracted mineral, under that rule, the above authorities are not altogether in harmony. Numerically they support the rule to deduct from the value of the mineral at the mouth of the mine the expense of extracting it, and the difference is taken as its value as it lay in the earth. But the Pennsylvania cases, *supra,* and perhaps some others, hold that the universal and customary royalty paid for the right of mining the particular substance in the locality is the proper criterion of its value in its natural state in the earth, and this seems to be the rule adopted by this court, where the defendant acted in good faith, whether he be a cotenant with the plaintiff or a trespasser. Gerkins v. Kentucky Salt Co., 24 Ky. Law Rep. 34; Same v. Same, 100 Ky. 734; Sandy River Cannel Coal Co. v. Whitehouse Cannel Coal Co., 125 Ky. 278; Burke Hollow Coal Co. v. Lawson, 151 Ky. 305; Bennett Jellico Coal Company v. East Jellico Coal Company, 152 Ky. 838.

In each of the Kentucky cases just cited the defendant was an innocent trespasser, except in the Gerkins case he was a cotenant, and in all of them, as well as in the

Pennsylvania cases, where the royalty basis of accounting was adopted, a recovery was sought for *past* operations. But in none of the cases, either from Pennsylvania or Kentucky, was that basis sought to be applied so as to vest in the defendant the right to continue to operate the mine in the future upon the royalty basis, or to compel plaintiff to submit to that method of accounting for future extracted minerals.

Following the royalty basis of accounting as adopted by the cases from this court, *supra*, as well as cases from other courts, we conclude that the court erred in adjudging to plaintiff any greater interest in the oil produced from the land up to the filing of this suit than a 1/56 of the amount thereof, being one-eighth of her one-seventh interest in the land. But no court (except as hereafter stated) has gone to the extent of applying the royalty basis of accounting, either to a willful or malicious trespasser, or to a cotenant who operates the jointly owned mine with the knowledge of his cotenants' interest. From the time of acquiring such knowledge he ceases to be an innocent *bona fide* operator, and he must account to his joint owners upon a different basis.

In cases of a willful trespasser the rule seems to be well settled, as will be seen from the authorities, *supra,* that the plaintiff is entitled to recover, in a suit for an accounting, the value of the mineral, without deducting any expenses incurred in mining it. But we do not understand that this stern rule should be applied in cases where a cotenant operates the mine with the knowledge of his cotenants' interest. Especially should this rule not be applied against a cotenant where the mineral involved is of a fugacious nature and liable to be exhausted by adjacent operators. In such case if one tenant is able and willing to develop the mine and extract the oil before it is entirely lost and his cotenant is not, he should be allowed to do so without incurring the penalty of accounting to his cotenant for the gross amount of oil produced; but since he may not convert, to any extent, his cotenant's interest, he must account to the latter for his proportion of the net value of the oil produced, which is its market value, less the cost of extracting and marketing. Any other rule, it seems to us, would be not only inequitable, but illogical, for if the operating tenant could be made liable for the gross amount of the plaintiff's proportion of the oil produced, the rights of the

former would be fixed according to the rules governing an operation by a willful trespasser who had no interest whatever in the mineral. We can not believe that an exclusive operation by one joint tenant is so tainted with wrong as against his cotenant as to require the application of the same rules that should be applied to a willful trespasser. Moreover, it would be illogical to say that a cotenant could lawfully operate the joint property (as he may do. Thornton, *supra,* sec. 312) and at the same time be compelled to divide the gross proceeds or profits with his joint tenant, thus circumscribing his rights according to the rule applicable to a willful and malicious trespasser without pretense of title or right. There is no rule of law known to us that would render the plaintiff cotenant immune from the observance of that healthy maxim, "He who seeks equity must do equity," and the *equity* which plaintiff in such cases is required to do so is to pay his proportionate part of the actual expenses of operation and marketing, if they are not above that which is usual and customary in that locality.

In the Gerkins case, *supra,* from this court, this statement is made in the closing part of the opinion: "The contract of lease should be treated as void as against appellants, and if the company has been reimbursed for its improvements, unless this has already occurred, appellants should receive a fair royalty for any further operation of the well by the company."

It is insisted by counsel for the oil company that this statement is an adjudication that the customary rent royalty was intended to be adopted as the basis of accounting, in cases like this, for future mining operations. But we do not so interpret the statement. There is nothisg in the opinion to show the sense in which the word "royalty" was used. For aught that appears it was intended to include plaintiff's proportionate part of the extracted minerals, but if used in the sense contended for it is the only reported case, so far as we have been able to learn, so holding. No authority is cited in the opinion in support of that contention, and we decline to adopt that construction in this jurisdiction as a sound principle of law.

It results, therefore, that the court adopted the proper method of accounting for all the oil produced by the oil company from the leased premises after it re-

ceived notice of plaintiff's interest, which was the date of the filing of her suit.

It is insisted that what is termed "overhead expenses," or fixed charges, should not have been included as a part of the expenses deducted, but we think otherwise. Such overhead or fixed expenses consisted in salaries of officers, bookkeepers, stenographers, and perhaps other items not immediately connected with the mining operation, but they were as necessarily incurred in the complete equipment of the company for mining operations as were the other expenses connected therewith, and were properly included in the total expenses deducted. Upon this branch of the case the court, upon its return, will ascertain the amount of oil taken from the lease by the oil company up to the time of filing the suit, and give plaintiff a judgment for one-fifty-sixth thereof. It will then adjudge to her one-seventh of the oil thereafter produced, less expenses of operation as above indicated; she should also be charged with one-seventh of the expense of the equipment, including the cost of drilling wells (which cost was incurred before the filing of the suit), after which she will own a one-seventh undivided interest in the wells and other equipment on the lease, and entitled to a voice in future operations.

The last point for consideration is: What are the rights of the oil company as against J. F. McKinney, its lessor, under the facts of this case? The court determined either that he practiced a fraud upon the company, as stated in subdivision (a) above, or that there was a breach of an implied warranty contained in his lease, as set out in subdivision (b) above, but from the judgment we can not tell which the court adjudged to be true. The evidence convinces us that J. F. McKinney was guilty of the fraud alleged against him in the oil company's cross-petition. Two witnesses testified that he stated before the delivery of the written lease that all of the signers of the deed to him were over twenty-one years of age. He admitted in his first deposition that he made such a statement, but claimed that it was made after the deed had been delivered. He subsequently retracted that statement upon the ground that he was confused when he gave his first testimony. However this may be, we are convinced that the terms of his lease are sufficient to raise an implied warranty of title to the leased premises, as well as one for quiet enjoyment.

Taylor on Landlord & Tenant, section 252, in stating the rule with reference to implied covenants in leases, says:

"Implied covenants depend upon the intendment and construction of law; and are such as the law raises from the relation of the parties or from the use of certain terms in establishing that relation, in the absence of any express agreement on the subject, between them. Thus, if land be granted for a term of years, by the words 'demise' or 'grant,' without express covenant for quiet enjoyment, the lessee or his assigns, if the lessor's title proves to be defective, or he is ousted by rightful title, may sustain an action on the implied covenant that the lessor warranted a good title at the time of executing the deed; for the word 'demise' imports a covenant for quiet enjoyment as well as a power of letting." See, also, sections 256, 304, 305 and 306 of the same work.

To the same effect is Thompson's Title to Real Property, section 407; Washburn on Real Property, sections 668, 668a; Tiffany on Real Estate, section 43, and Scott v. Rutherford, 92 U. S. 107.

Indeed counsel for J. F. McKinney does not, as we interpret his brief, dispute this proposition. According to the above authorities the lease in this case contains all of the language required from which implied covenants would arise. It says:

"That the said parties of the first part (McKinney and wife) . . . have granted, demised, leased and let, and by these presents do grant, demise and let unto the said party of the second part, its successors and assigns," &c.

This being true, the next question is what is the measure of damages for the breach of the implied covenants, which breach neither is nor can be denied in this case? The rule without exception is that upon a breach of a covenant for title or for quiet enjoyment resulting in an eviction, the measure of damages is the value of the land at the time of the execution of the instrument containing the covenants. Marshall's Heirs v. McConnell's Heirs, 1 Littell 417; Cummins v. Kennedy, 3 Littell 118; Cox's Heirs v. Strode, 2 Bibb 273; Hunt v. Orwig, 17 B. Mon. 73; Blackwell v. McBride, 14 Ky. Law Rep. 760; Graham v. Dyer, 16 Ky. Law Rep. 541; Mercantile Trust Company v. South Park Residence

Company, 94 Ky. 271, and Devlin on Real Estate, vol. 1, sec. 934.

In some of the earlier cases it was held that the consideration paid or agreed to be paid was only *evidence* of the value of the land at the time of the conveyance, but the later cases hold that the consideration agreed to between the parties will be *conclusive* in a suit for breach of warranty where there has been a failure or partial failure of title, and the amount recoverable in case of a partial failure is such proportion of the consideration as the part of the land lost by superior title bears to the whole tract. In stating this rule the court in the Mercantile Trust Company case, *supra*, said:

"In Cox's Heirs v. Strode, 2 Bibb 273, it is said: 'The Supreme Courts of New York and Pennsylvania have determined that on a covenant of seisin the rule of compensation is the value of the land at the time of entering into the covenant, to be ascertained by the consideration paid, with interest and costs attending the eviction.' This rule is unqualifiedly endorsed, and has since been invariably followed. (See Cosby v. West, 2 Bibb 568; Thompson's Heirs v. Jones, 11 B. M. 365)."

The instant case presents the peculiar feature of a partial failure of title (one-seventh to plaintiff), while the consideration agreed to be paid (one-eighth of the oil) is for the entire title and is perhaps less than the value which the oil company loses by reason of the *pro tanto* eviction. But since the purpose of such covenants is to restore to the covenantee what he loses by the breach, to the extent of the consideration, we are of the opinion that in a case like this the measure of recovery should be gauged not by the aliquot part of the land or lease which is lost by eviction, but the recovery should be the value of that part so lost, not to exceed the agreed consideration. Taylor on Landlord and Tenant, vol. 1, section 317. This is certainly required in order to restore to the oil company what it has lost. It agreed to incur the expense of operation in consideration that it receive seven-eighths of all of the oil produced, and because of the *pro tanto* eviction by plaintiff it is compelled to pay her one-seventh of the net amount of oil produced. In other words, it is compelled to pay plaintiff alone, because of the breach of implied covenants in the lease, one-fifty-sixth more of the oil produced than it agreed to

pay J. F. McKinney for all oil produced, with this difference, that the one-seventh of the oil produced after the filing of the suit, and herein adjudged to belong to plaintiff, is net, while the one-eighth agreed to be delivered to J. F. McKinney as consideration for the lease, was gross. It is our conclusion, then, that the oil company is entitled to recover from J. F. McKinney on his breach of implied warranty an amount equal to the net value of the one-seventh of the oil produced after the filing of the suit, and herein adjudged to plaintiff, and if this sum equals the one-eighth of the gross amount of oil produced, which the oil company agreed to pay as royalty, the lessor will not be entitled to collect anything from his lessee. But if the net value of the oil herein adjudged to plaintiff be less than the one-eighth royalty, the lessor, McKinney, should be paid the difference. We are unable, from the condition of the record, to make the calculations necessary to render judgment conforming to the principles herein announced.

Wherefore the judgment as to plaintiff and J. F. McKinney is reversed, and the court upon a return of the case will take such steps and hear such proof as may be necessary to enable it to render judgment in accordance with the principles of this opinion.