## Miles v. The United Oil Company.

(Decided June 3, 1921.)

### Appeal from Estill Circuit Court.

1. Assignments—Warranty of title—Construction.—The assignor of a lease of real estate or an interest therein does not by his mere act of assignment impliedly warrant the title of his lessor or the peaceable and quiet enjoyment of the leased premises by his assignee; hence, where a lessee agrees only to transfer his leases there is no implied covenant on his part that his lessors possess a perfect title to the leased premises, nor will there be an implied covenant for quiet and peaceable enjoyment of the leased premises by his assignee. But it is competent for such express covenants to be made in the assignment and whether its terms are broad enough to create them is a matter for construction and to be determined from the language of the assignment.

2. Contracts—Consisting of More Than One Writing.—While it is competent for a contract to consist of more than one writing, each of them should relate to the same subject matter; hence, a contract for the purchase only of the capital stock of a corporation does not relate to or form a part of prior negotiations for the purchase of the physical properties of the corporation and such prior negotiations will be treated as abandoned by the contract for the purchase of the stock.

ROBT. B. FRANKLIN, ROBT. C. TALBOTT, VIRGIL CHAPMAN and EDWARD C. O'REAR for appellant.

JOHN A. NIEDING, BEVERLY JOUETT, ROBT. R. FRIEND and CLARENCE MILLER for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, J. Fred Miles, was plaintiff below and the appellee, The United Oil Company, was defendant below. The action was filed in the Estill circuit court by plaintiff to recover damages of defendant for the breach

of an alleged contract to sell to plaintiff or to such purchasers as he might procure certain oil leases held by defendant upon 1,280 acres of oil producing land in Estill county and upon which it had a number of producing wells. The damages claimed by plaintiff as a direct consequence of the alleged breach was the sum of $712,500.00. His petition consisted of seventy-eight typewritten pages and two short amendments, to all of which a demurrer was sustained and upon his declining to plead further his action was dismissed, to reverse which he prosecutes this appeal.

The beginning step towards the formation of the alleged contract sued on was a writing in the nature of a letter addressed to plaintiff by the treasurer of the defendant on May 15, 1917, which writing, or letter, is signed "The United Oil Co., Inc., by C. J. Weideman, Treas.," and the body of it says: "You are hereby authorized and empowered and we hereby give you the right to offer and negotiate the sale of our United Oil Company property, incorporation of Kentucky, comprising the following twelve hundred and eighty (1,280) acres of leases, more or less, a copy of said leases hereto attached and made a part hereof, for the sum of one million five hundred thousand ($1,500,000.00) dollars, net to us. We further authorize you to bring any representative to our property to check up and gauge same, at your expense, and we will accept and make transfer of the property for the above consideration. This authorization to hold good and be binding on the above named corporation for forty (40) days from the date hereof." Following the incorporation of that writing into the petition the various leases of defendant on the 1,280 acres are set out *in hac verba* and they occupy twenty-eight pages of the pleading. The petition then continues by inserting numerous letters and telegrams from Weideman, the treasurer of defendant, to plaintiff and a few telegrams and one letter from himself to Weideman, in which for the most part Weideman was pressing plaintiff to bring to a close the sale of the leases, since the president of defendant and some of its other officers and stockholders were disinclined to accept the terms stated in the writing of May 15, and for the further reason that other prospective purchasers of the leases were appearing upon the scene. In one of the letters from Weideman to plaintiff the treasurer was insisting on knowing the names of those whom plaintiff had in mind as prospective purchas-

ers of the leases, and in response thereto plaintiff informed the treasurer that he himself was "one of the original purchasers up to $212,500.00." He declined to state who the others were except to say "if you know the Clarks in the oil world, this will give you all the information you need." That letter was dated May 26, 1917, and the next communication from plaintiff was a telegram to Weideman on May 29, requesting the latter to meet him at a designated hotel, presumptively in Cleveland, Ohio. What occurred between that time and the 13th day of June following, the petition does not inform us, but on the latter date Weideman telegraphed from Lexington, Kentucky, to the plaintiff in New York, saying: "You must act soon; can't hold out much longer." In reply to that telegram and on the same day plaintiff wired Weideman to come to New York, but the later answered that it was impossible for him to do so and requested plaintiff to meet him in Cleveland on the following Sunday, and stating that the proposition must be closed "by the first of next week." On the 14th of June plaintiff wired from New York to Weideman at Lexington, Kentucky, saying: "Don't go to Cleveland; must have you here at once; deal is approved; all cash; answer quick." On the 18th of June Weideman wrote plaintiff a letter in which he copied a number of telegrams passing between him and other officers and stockholders of defendant in which it appears that the communications between Weideman and the other officers and stockholders of defendant referred to the *sale* of all of the *stock* held by the shareholders in the corporation and it was arranged for all paties to meet in Cincinnati on the 20th of June, which they did and there entered into a contract relating exclusively to the sale of all the stock in the defendant company, for the consideration of $1,500,000.00 to be paid the stockholders and $200,000.00 to be paid plaintiff as consideration for certain other leases in the vicinity of the 1,280 acres to which he held title and which he agreed to assign to the purchasing corporation, either then or thereafter to be created. Other correspondence copied into the petition shows that plaintiff was depending upon a banking firm located, as we gather, at Cleveland, Ohio, by the name of Bonbright & Co., to furnish the money with which to pay for defendant's leases and which arrangement, whereby Bonbright & Co. was to furnish the money, was made with an associate of plaintiff named J. I. Lamprecht, and the letters from the latter to plaintiff

show that he made no contract with plaintiff to agree to purchase and pay for the leases or for any other purpose until *July 13, 1917,* more than twenty days after the expiration of the forty days stated in the writing of May 15, 1917, upon which plaintiff bases his suit. It is alleged that some of the lessors of defendant did not possess merchantable titles to the leased premises (excluding the Marcum lease which was known to plaintiff), and because of the failure of those titles plaintiff did not tender any part of the $1,500,000.00 consideration agreed to be paid, and only because of such defective titles the purchase was not consummated and he lost the benefit of his alleged contract and sustained the damages for which he sues.

It will at once appear that plaintiff's right to recover is based upon the two propositions; (a), that the negotiations above outlined formed a complete and binding contract for plaintiff to sell the leases of defendant for the named consideration, and (b), that its failure to do so brought about exclusively by its defective titles to some of its leases, which titles plaintiff alleged defendant impliedly warranted by the execution of the writing of May 15, hereinbefore inserted. It is alleged in the petition that the defendant "in offering and proposing to sell the leases, claimed by defendant to be owned by defendant, covering the twelve hundred and eighty (1,280) acres, the defendant held itself out to plaintiff as having good and merchantable titles thereto for the purposes set out in said leases, and defendant by implication of law undertook, offered and proposed to pass, convey and transfer to any purchaser thereof good and merchantable titles, and the right of peaceable and quiet enjoyment thereof." Manifestly if either one of these propositions is untrue plaintiff's right to maintain the suit fails and the demurrer to the petition was properly sustained.

We have concluded to consider the two propositions in the reverse order in which they are stated above and to first inquire whether, assuming that the negotiations reached the stage of a completed contract, defendant agreed in the above copied writing of May 15 to warrant the titles of its lessors to any part of the 1,280 aces upon which it held leases, or whether it agreed with plaintiff that any purchaser to whom he might sell the leases would obtain "the right of peaceable and quiet enjoyment thereof." It is certain that there were no express covenants to the above effect and unless the law raised them by implication none existed.

It is insisted by counsel for plaintiff that under the terms of that writing the law implied a covenant obligation on the part of defendant to warrant or guarantee the titles of all of defendant's lessors to the various tracts of land on which the leases were held, and in support of that contention he cites the case of Headley v. Hoopengarner, 55 S. E. Rep. (W. Va.) 744, and the case of New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, each of which holds that the *lessor* of real estate by the use of the words "let," "demise" or "grant" in his lease impliedly covenants that he has a good title to the leased premises, and that those words import a covenant of quiet enjoyment. A number of other cases and text books are referred to in the McKinney case and we have no quarrel to make with the doctrine contended for, since we think it is firmly established in the jurisprudence of this country. The unfortunate part of the contention, however, so far as plaintiff is concerned, is that we have no such case here. The defendant is not the owner of any of the leased premises and is in no sense the *lessor* of any of them, and the writing of May 15, 1917, does not pretend to characterize it as a lessor, nor does defendant pretend to assume therein any of the obligations of a lessor. All that was proposed to be done by defendant in that writing, as a consideration for the $1,500,000.00, and all that defendant agreed to do therein was to "make' *transfer* of the property (leases) for the above consideration," i. e., it agreed to perform such acts as were legally necessary to convey the title to the property (the leases) from it to plaintiff, or to such purchasers as he might produce. The *property* which defendant therein proposed to transfer necessarily referred to the leases which were also referred to therein. Indeed, those leases constituted the only property mentioned or referred to in that writing. Clearly, as we have said, defendant did not expressly covenant in the writing referred to that its lessors possessed a good title to the leased premises, or that the proposed purchasers or transferees of the leases would receive the right of quiet and peaceable enjoyment of any of those premises. As we have seen, the writing of May 15 contained nothing more than an agreement on the part of defendant to assign (transfer) its leases to such purchaser as plaintiff might produce within forty days. So, the question is, does an assignor of a lease in the absence of an express covenant, impliedly warrant to his assignee the title of his lessor to the leased premises,

or does he impliedly covenant that his assignee shall have the right of peaceable and quiet enjoyment of the leased premises?

Our investigation has convinced us that no such implied covenants arise from the mere act of assigning a lease, and no agreement for such covenants will be implied in favor of a produced purchaser by a broker or one authorized to procure such a purchaser where the only agreement with the broker was to ''transfer'' the lease. Supporting our conclusion the text in 16 R. C. L., 843, says: ''No covenants for title are implied in the assignment of a lease. Although the word 'grant' or 'demise' will in a lease create an implied covenant against the lessor, yet the same words in an assignment will not create an implied covenant against the assignor, the object and intent of the parties in making an assignment being to put the assignee in the place of the lessee; when that is done, the assignor ceases to have any further concern with the contract unless he has bound himself by express covenants.'' In a note to the case of Crouch v. Fowle, 32 Amer. Dec. 350, on page 356, the annotator says: ''No covenants for title are implied in the assignment of a lease; Rawle on Cov. 463; Landydale v. Cheynet, Cro. Eliz. 157; Walso v. Hall, 14 Mass. (Tyng) 486; Blair v. Rankin, 11 Mo. 440.'' To the same effect is the case of McClenahan v. Gwynn, 3 Munford (Va.) 556. In the Waldo case, which was a suit by an assignee of a lease against his assignor for breach of an alleged implied warranty of title of the lessor growing out of the assignment, the court in denying the plaintiff relief said: ''There is no instance produced, nor can we find any, of an action by an assignee against an assignor, *upon a covenant in law*, for an eviction in consequece of an act done by the original lessor; although there are express resolutions, that it lies for the assignee against the assignor upon express covenants.'' The Blair case was the same character of suit, except the language of the assignment was broad enough to create an implied warranty of title by a lessor and to that extent was a stronger case for the assignee (a position occupied by plaintiff here), than are the facts of the instant case. The court in drawing the distinction between the implied warranty of the lessor, and one between the lessee as assignor of the lease, said: ''Although the word grant or demise will in a *lease* create an implied covenant against the lessor, yet it is nowhere said that the same words will in an assignment create an

implied covenant against the assignor. The object and intent of the parties in making an assignment is to put the assignee in the place of the lessee, and when that is done, the assignee ceases to have further concern with the contract, unless he has bound himself by express covenants.''

We have been unable to find any case or any authority (except as hereinafter stated) contrary to the doctrine of those referred to. There is a statement in the text of 24 Cyc. 948, that the better rule is, in the absence of a stipulation to the contrary, ''there is an implied undertaking (by the assignor) to make out the lessor's title to the demised premises,'' and there is cited in support of the text the cases of Jeffers v. Easton, 113 Cal. 345; Krause v. Krause, 58 Ill. App. 559; Wetzell v. Richcreek, 53 Ohio St. 62, and two English cases, one of which is Purvis v. Rayer, 9 Price, 488.

We have examined those cases and when analyzed they do not, according to our conclusion, support the text except the Illinois case of Krause v. Krause, which but meagerly does so. The Wetzell case was not only bottomed upon fraudulent representations made by the assignor of the lease but plaintiff also relied upon an express written guaranty of all the rights which the lease proposed to confer. The court discussed the question of implied warranties by an assignor of a lease but declined to rest the opinion upon that doctrine which is shown by this statement found therein: ''But it is not deemed necessary to determine here what, if any, obligation may be implied from the assignment of the lease. It is, of course, competent for the parties to introduce into the assignment any covenant or stipulation pertinent to the subject which they have agreed upon; and, it is not unusual for the assignor to covenant that the indenture of lease is good, that he has power to assign, that he will save the assignee harmless from former grants and incumbrances, and for quiet enjoyment. 2 Taylor on Landlord and Tenant, section 431. The instrument of guaranty by the defendants, and delivered to the plaintiff contemporaneously with the delivery of the assigned lease and the payment of the balance of its purchase price, was founded upon a sufficient consideration, and became a part of the contract of assignment. By it, the defendant stipulated that the lease was in full force and effect at the time of its assignment and delivery to the plaintiff, and guaranteed to him 'the rights and title of said lease.'

This amounts to an express covenant of the assignor's title to the term demised, and for its quiet enjoyment by the assignee.'' The Jeffers case was one brought by the assignor to recover the difference in the rent agreed to be paid to him and what he agreed to pay the lessor. Defense was made upon the ground that plaintiff had fraudulently represented the perfect title of his lessor, and upon the further ground that another held title to the leased premises from whom defendant had leased them and that the consideration agreed to be paid his assignor of the lease had failed. The court not only found that the two defenses referred to existed in fact, but in the course of the opinion. and in what we conceive to be an obiter statement, it treated the assignor as sustaining the same relation to his assignee that a lessor does to his lessee, and held that the leasehold estate was a chattel interest and that the seller of it impliedly warranted the title, which is true, but the mistake which, in our judgment, the court made was in saying that the assignor of the lease impliedly warranted not only his title but also impliedly warranted the title of his lessor to the leased premises. There were ample grounds to support the opinion without referring to the question of implied warranty.

In the Illinios case the opinion contains a very meager statement of the facts and does not pretend to state any of the terms of the assignment. The only reference to the question now under consideration in the entire opinion is this short statement: ''In every contract for sale of land, a condition is implied for a good title, and if the sale be of a lease, that the lessor had such a title as made the lease good. Fry, Spec. Per., sec. 354; Purvis v. Rayer, 9 Price 488.'' We have examined the authorities referred to in that statement and they not only do not sustain it but the reference to the work on Specific Performance by Mr. Fry (section 354) does not even deal with the point. Excepting the Illinois case of Krause v. Krause (which is only an intermediate court opinion), and the dictum in the Jeffers case, we have been unable to find any opinion of any American court contrary to the above quoted text from 16 R. C. L. The doctrine therein announced is not only supported by the great weight of authority, but we think it is sustained by much the better reasoning. By merely transferring his lease the lessee only places his assignee in the same relationship toward the lessor as was occupied by the lessee, and all warran-

ties and covenants by the lessor (by implication of law or otherwise) are transferred to the assignee by the assignment. Nothing else is implied as against the assignor and if the assignee desires further assurance from the lessee, his assignor, he should exact express covenants for that purpose. The conclusion reached disposes of the case, since it was only because of the alleged failure of titles to some of the leased lands that the contract was not performed, and, necessarily, if defendant never warranted those titles it would not be responsible for their defects.

However, if it were otherwise we think it could be conclusively shown that plaintiff never entered into any contract with defendant for the purchase of its physical properties, or entered into any other contract except one with the stockholders of defendant for the purchase of their stock, which is altogether a different contract than one for the purchase of its properties. An essential fact entitling plaintiff to recover was that he should find a willing purchaser within the forty days mentioned in the writing of May 15. He claims that his telegram of June 14, hereinbefore referred to, was a notification to defendant that he had found such purchaser within that time. We do not so construe that telegram on its face; but if we should assume that it was sufficient for that purpose, other parts of the petition conclusively show that defendant had not found a purchaser within the forty days and had not entered into any contract for any purpose until *July 13, 1917,* long after the expiration of the forty days; and while that date was within the extended period given to the contract of June 20 for the purchase of the stock it was, as we have seen, an entirely different one from that sued on in this case. Blagen v. Thompson, 18 L. R. A. 315, and Cincinnati Equipment Co. v. Big Muddy River Consolidated Coal Co., 158 Ky. 247.

But we will not further elaborate the second proposition, since the disposition made of the first one is sufficient to sustain the judgment, and it is accordingly affirmed.