## Kramer v. Mobley.

January 14, 1949.

H. Randolph Kramer and Ben B. Morris for appellant.

H. H. Lovett and M. C. Anderson for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

V. H. Mobley, appellee here and plaintiff below, brought this action against T. J. Kramer to recover damages for the breach of a contract for the sale of 745½ acres of land located in Ballard County. The plaintiff alleged in his petition that the land was reasonably worth $10 an acre more than the agreed price, and that the difference between the agreed price plaintiff was to pay and the actual market value of the land was, at least, $7,455. He sought to recover that amount and, in addition thereto, the sum of $250, the alleged expenses incurred by him including the cost of an investigation of the title. By agreement of the parties, the case was submitted to the court without the intervention of a jury, and the court found that the land was actually worth $67 an acre, or $2 an acre more than the agreed price of $65. The court also found that the plaintiff had incurred some expense which he should be compensated for by the defendant by reason of the defendant's refusal to complete the transaction. It was adjudged that the plaintiff recover the sum of $2,000, and the defendant appeals.

T. J. Kramer purchased 901 acres of land, including the 745½ acres involved in this controversy, from C. E. Gordon and Bertha F. Gordon. The deed executed by the Gordons was dated September 30, 1943, and recited a consideration of $1 cash and the payment of $22,750

on or before January 1, 1944, the deferred payment being evidenced by a note secured by a lien retained on the land. On March 27, 1944, Bertha F. Gordon signed a release on the margin of the deed book which recited that $20,612 had been paid on the note. In December, 1944, Kramer listed the land with King C. Dunn, a real estate broker, for sale. V. H. Mobley became interested as a prospective purchaser, and on April 21, 1945, met Kramer and Dunn on the land. After considerable negotiations, Kramer agreed to sell the 745½-acre tract of land to Mobley for $65 an acre, or a total of $48,457. The sale price included all of the personal property on the farm except a saddle mare. The value of the personal property included in the sale was less than $1,000. A written contract, signed by Mobley and King C. Dunn, agent, provided that $15,457 should be paid upon execution and delivery of the deed and $33,000 should be paid at the rate of $5,000 a year, the deferred payments to be evidenced by notes secured by a vendor's lien. Mobley delivered to Dunn a check for $5,000, the proceeds to be applied on the cash payment. The contract provided that the deed should be delivered within ten days. Kramer and his wife executed two deeds to Mobley on April 23, 1945, one providing for payment of the purchase price in cash and one providing for a cash payment of $1 and the balance on terms in accordance with the written contract of sale. It appears that Mobley had expressed a desire to pay all of the purchase price in cash if he could secure a mortgage loan from his bank. The parties met at Dunn's office on April 24 to conclude the transaction, and Mobley informed Kramer that an examination of the records disclosed a lien on the land for $2,138 in favor of Gordon. Mobley testified that the encumbrance upon the property was unknown to him when he executed his agreement to purchase, and that he learned of it for the first time two days later when he had the title examined by an abstractor. Kramer testified that he informed Dunn, the real estate broker, when the agency contract was executed that the validity of the $2,138 lien was in dispute, and that the purchaser must accept deed with indemnification against loss by reason of the lien until its validity could be determined in a court proceeding. Dunn, who was a witness for appellee, was unable to remember whether he so informed

Mobley. At the meeting on April 24 Kramer explained that the validity of this lien was in dispute since he claimed that Gordon wrongfully moved from the land property of the value of $2,138 when he gave possession. Kramer stated that he would bring an action against Gordon to have the validity of the claim determined and the title cleared, and proposed to deliver to Mobley a certified check for $3,000 to indemnify him against loss by reason of the lien. There is evidence that this arrangement was substantially agreed to, and that it was satisfactory to the banker who had agreed to make a loan to Mobley to be secured by a mortgage on the land. However, before the negotiations were concluded the parties recessed for lunch with the understanding that they would meet again after lunch. During the recess period Mobley encountered Gordon who informed him that he would have trouble if he accepted the deed without requiring a release of the lien. The negotiations broke down at the afternoon meeting, but another meeting was held at a bank in Benton on Monday, April 30. At that meeting Kramer tendered to Mobley a general warranty deed and a certified check for $3,000, but Mobley refused to accept the deed unless Kramer paid off Gordon's claim of $2,138 and obtained a release of the lien. Kramer insisted that he owed no part of the claim and promised to clear the title in an action which he would institute against Gordon. Mobley refused to agree to this arrangement, his $5,000 check was returned to him, and the negotiations were dropped. Later Mobley brought this action.

Appellant first argues that the real estate agent, Dunn, was without authority to bind his principal, Kramer, and that the contract of sale was not enforceable since it was not signed by Kramer. Huddleston v. Disney, 304 Ky. 164, 200 S. W. 2d 109, is cited in support of the argument. In that case we approved the holding in Speiss v. Martin, 192 Ky. 211, 232 S. W. 615, that in the absence of a special authorization a real estate broker has no power to enter into a contract for a purchase or sale of land so as to bind his principal, and we held that the agent in the Huddleston case was without such special authorization in view of the language of the contract between Huddleston and the real estate broker. In the present case the agency contract between appel-

lant and Dunn, which was in writing, contained this: "I hereby appoint you exclusive agent to make sale of real property herein described * * * and you are hereby authorized to accept a deposit to be applied on the purchase price and to execute a binding contract for sale on my behalf." Thus the agent, Dunn, had explicit authorization to enter into a written contract of sale binding on his principal.

The main question presented for our determination is: What are the rights of the purchaser of real estate under an executory contract where the sale fails by reason of a defect of title, or what is the proper measure of damages? It is the general rule that where the seller under an executory contract for the sale of personal property breaches his contract by failing to deliver the property, the measure of damages is the difference, if any, between the contract price and the market value of the property either at the time of the breach or at the time fixed for delivery. King v. Herbert Bauman Lumber Company, 223 Ky. 782, 4 S. W. 2d 699; Elder v. Florsheim Shoe Company, 209 Ky. 509, 273 S. W. 60. The same rule as to the measure of damages is usually applied where the vendor in an executory contract for the sale of real estate wilfully refuses to convey to the vendee a good or marketable title as required by the contract. New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, 221 S. W. 245; Gordon v. Wanless, 231 Ky. 498, 21 S. W. 2d 815. However, it is the rule in this and many other jurisdictions that if the sale fails by reason of a defect in the vendor's title and the vendor is guilty of no bad faith or fraud, the measure of the vendee's damage is substantially the same as in the case of an executed sale; that is, the vendee may recover any consideration he has paid, with interest, and any legitimate expense incurred by him, but he can recover nothing for the loss of his bargain. The leading case on the subject in this jurisdiction is Crenshaw v. Williams, 191 Ky. 559, 231 S. W. 45, 48 A. L. R. 5, where the cases are collected and the reason for the rule is elaborately discussed. The question was again thoroughly considered in Potts v. Moran's Ex'rs, 236 Ky. 28, 32 S. W. 2d 534, and the rule announced in Crenshaw v. Williams was approved. In the course of the opinion it was said:

"After an examination of the decisions of this and

other courts, we announced the rule that a vendee of real estate is not entitled to damages for the loss of his bargain upon the inability of the vendor to make a good title, where the vendor acted in good faith and was guilty of no active nor positive fraud in the transaction. We also held that mere failure of a vendor of real estate to refer the vendee to his record of title, or the judicial decisions bearing upon it, was not such fraud as to deprive him of the benefit of the rule that damages for loss of bargain will not be awarded against a good-faith vendor who is unable to convey a good title. In reaching this conclusion we called attention to the fact that we had uniformly ruled that the measure of damages upon a breach of warranty of title was the value of the land lost as fixed by the consideration paid or agreed to be paid. We further pointed out that, with respect to the measure of damages, there was no substantial difference between a breach of warranty of title, and the breach of a covenant to convey where the vendor acted in good faith, and quoted with approval the following excerpt from the opinion of this court in Goff v. Hawks, 5 J. J. Marsh. 341: 'Since the decision in the case of Cox's Heirs v. Strode, 2 Bibb (273), 276, 5 Am. Dec. 603, the criterion of damages upon a covenant to convey land, which has been violated, but without fraud on the part of the covenantor, is the purchase money and interest thereon, or in the language of the case of Rutledge v. Lawrence, 1 A. K. Marsh. (396), 397, it is, the ''value of the land at the time of the sale, to be ascertained by the consideration fixed or other evidence.'' If, however, the covenantor has been guilty of fraud, a different rule may govern the case. Then, he would be responsible for the increased value of the land, at the time his covenant should have been performed.' ''

In the Potts case the vendor's wife refused to unite in the deed conveying the property, and, in discussing the question of bad faith, the court said:

''Here no bad faith on the part of Moran was charged or proved. On the contrary, he evinced his good faith by an offer in his answer to convey the land and deduct therefrom the value of his wife's inchoate right of dower, and to pay Potts all the expense to which he had been put. All that we have is the wife's refusal to join in the deed.''

A collection of authorities on the subject may be found in the annotations in 48 A. L. R. 12 and 68 A. L. R. 137.

In the present case a good title could have been conveyed if appellant had paid the disputed debt and had obtained a release of the lien. His refusal did not constitute fraud or bad faith. He made a fair offer to indemnify appellee against loss pending an action to determine the validity of the lien. It is true that appellee could not have been compelled to accept the proffered deed in an action for specific performance, but this has no bearing on the question of appellant's good faith. The vendor is not compelled to make a substantial sacrifice in order to avoid the charge of fraud or bad faith. In Crenshaw v. Williams, supra, it was said (191 Ky. 559, 231 S. W. 46):

"* * * our investigation has shown that the courts generally, including this one, deny such recovery (damages for loss of one's bargain) in the sale of real estate where the vendor acts in good faith, and is guilty of no positive or active fraud in the transaction."

The appellant was guilty of no positive or active fraud in the transaction, and the court erred in awarding as damages the difference between the contract price and the market value. The court allowed as damages in this respect the sum of $1,491, leaving the sum of $509 allowed as expenses incurred by appellee. The latter allowance is excessive in the light of the pleadings and the proof. Appellee alleged in his petition that he had incurred expenses in the sum of $250, but the only expense concerning which proof was introduced was the cost of the examination of the title. Appellee testified that he had not paid any amount on this account, but the abstracter had informed him the cost would be $30 to $50.

Judgment is reversed for further proceedings.