TEC CORPORATION, an Indiana Corporation, et al., Plaintiffs,

v.

NUCLEAR DYNAMICS, INC., an Arizona Corporation, Defendant.

Civ. A. No. 1574.

United States District Court,
E. D. Kentucky,
Pikeville Division.

Oct. 18, 1974.

William G. Craig, Sandidge, Holbrook, Craig & Hager, Owensboro, Ky., for plaintiffs.

Joe F. Walton, Phoenix, Ariz., C. Kilmer Combs, Pikeville, Ky., for defendant.

MEMORANDUM OPINION

HERMANSDORFER, District Judge.

The initial consideration of this case is reported at 364 F.Supp. 1165 (E.D.Ky.1973) in which cross-motions

for summary judgments were denied and the sole fact question of defendant Nuclear Dynamics, Inc.'s good faith or bad faith was defined. Evidence has been presented on that question and the final brief was filed on September 4, 1974. Although the contextual facts are set forth in the earlier Memorandum Opinion, I will deal generally with the facts again because of the nature of the inquiry.

The plaintiff Thomas Egan is the President of TEC Corporation, an Indiana corporation. His brother, Louis Egan, and Robert Barbre are, by the Complaint, denominated joint venturers, but under the evidence would more correctly fall into the category of associated brokers. All plaintiffs will be referred to herein as TEC for convenience unless specific identification is necessary. The defendant Nuclear Dynamics, Inc. is an Arizona corporation and will be referred to hereinafter as Nuclear. The property involved is the actively mined coal leases of Hobert E. Potter and Walter P. Walters, Jr. situated in Floyd County, Kentucky. No particular description of the property is useful to a determination of the question involved and reference will be in general terms to the subject property.

The immediate question arises out of an executed letter agreement signed by the parties or their authorized representatives on September 3, 1971 under which the defendant Nuclear undertook to pay broker's commissions under specified conditions, to-wit:

"Gentlemen:

"This letter, when countersigned by Messrs. Iley B. Browning, Jr. and Thomas M. Egan, acting for themselves and in behalf of and with the authority of TEC Corporation, Louis Egan and Robert Barbre, will constitute the agreement of all of them to receive, and the agreement of the undersigned Nuclear Dynamics, Inc., to pay the following sums:

"Iley B. Browning, Jr. the sum of $75,000.00;

"TEC Corporation, the sum of $75,000.00;

"Louis Egan and Robert Barbre, jointly, the sum of $50,000.00, being a total payment of $200,000.00.

"Such payments shall become due and payable only in the event that (and at the time that) Nuclear Dynamics, Inc. shall exercise its option to purchase under the terms of a certain option to be dated September 9, 1971 between Potter and Walters Coal Company, a partnership between Hobart E. Potter and Walter P. Walters, Jr.

"Payment of the above sum by Nuclear Dynamics, Inc., to the undersigned is agreement to be payment in full to them for all fees or commissions accruing by virtue of their services rendered in connection with the above purchase and sale and will extinguish all obligations between the parties."

The option of September 9, 1971 bearing the preamble date of August 11, 1971 is between Potter and Walters and Nuclear. It was executed by Nuclear's President, Joe F. Walton, on September 3, 1971 and by Hobert E. Potter and Walter P. Walters, Jr. on September 9, 1971. All parties have dealt with the document and no confusion is found to exist with respect to the document being the one referred to in the letter agreement of September 3, 1971. This option was never exercised. It called for payment of $3,200.00 by cashier's check not later than November 1, 1971. The primary term of the option was to midnight October 1, 1971, but upon "written notice prior to midnight October 1, 1971, that Optionee is in good faith contemplating the exercise of this Option and needs the additional time to make a judgment", the time would be extended to midnight of October 15, 1971.

I find that Nuclear did secure an extension of time, under the terms provided for such extension, in good faith. I find that Nuclear diligently attempted to secure financing for the purchase of

the coal properties under this option. Mr. Thomas Egan was aware of the efforts and agrees that Nuclear tried to secure financing. (Egan Deposition, November 2, 1972, pages 58 and 59.)

There is no doubt that Nuclear had expended a substantial sum of money and the time of key personnel in attempting to acquire the coal properties before October 15, 1971. This is significant in reaching the evidentiary question of good or bad faith because of TEC's prior conduct. The evidence establishes that TEC made an initial contact with Iley B. Browning, Jr. prior to or in early February 1971 to assist in locating coal properties which resulted in the identification of the subject properties. I find that Browning advised the properties were for sale for $3,000,000 in cash. The evidence clearly establishes that on July 2, 1971 Louis Egan and Robert Barbre were advised by TEC Corporation that the terms of the sale were cash, but on July 21, 1971 Robert Barbre, signing for Louis Egan, notified Nuclear that the properties were available for $3,200,000 on terms of $1,000,000 in cash, the balance to be paid in three or four years as might be negotiated. I find that Nuclear learned of the misrepresented terms no earlier than August 30, 1971 and no later than September 2, 1971. At that time Nuclear had already spent a substantial sum in evaluating the properties and attempting to finance them.

The letter agreement of September 3, 1971 obviously was an effort of compromise. TEC had been pushing a coal deal for which they, in fact, had no option. Mr. Browning had acquired for no consideration an option in early February 1971 which expires on February 28, 1971. No other option was involved until August 11, 1971 when Browning took an option in his own name from Potter and Walters after learning of the involvement of Louis Egan and Robert Barbre and that the property had been offered on terms where his dealings

with the owners had always been on the basis of cash.

I find that the parties were dealing strictly at arms' length in executing the letter agreement of September 3, 1971. I further find that on September 3, 1971 the original brokerage terms offered by TEC to Nuclear of an installment purchase were known to Nuclear to be inapplicable and that the sale would be on the basis of cash and in terms equivalent to that of the Browning option of August 11, 1971. When Nuclear was unable to secure financing and the option of September 9, 1971 expired, no effort was made by TEC to secure any further interest in the properties. TEC, in fact, did nothing. Nuclear, however, contacted the property owners in an attempt to obtain another extension of the option from the owners but were dissuaded by the asking price of $50,000 cash for the same, finding the possibility of obtaining the necessary financing to be too remote to justify the expenditure.

Another fact thread must be woven into the circumstances. Mr. Iley B. Browning, Jr., on January 20, 1971, wrote a letter to Mr. Thomas Egan, the date of which later, and for unclear reasons, was changed to February 12, 1971, in which Browning acknowledged that he and TEC would be equal partners in the option on the subject property. On the uncontradicted evidence of Mr. Browning, I find that he believed there existed an immediate purchaser for the property for cash. Mr. Browning learned of the role of Louis Egan and Robert Barbre in early August and took a protective written option dated August 11, 1971. Mr. Browning communicated some unspecified information to Nuclear which accounted for a letter from Kelsey L. Boltz, Executive Vice-President of Nuclear, to Mr. Robert Barbre dated August 30, 1971. The text is quoted in its entirety:

"Dear Mr. Barbre:

"We have been proceeding with the steps necessary for the acquisition of

Potter and Walters' Coal Company, and, in this regard, we have been working very closely with Iley Browning who we understand is the primary broker in the deal. He has been kept up to date and, in fact, spends much time with our representative in Prestonsburg.

"He has suggested, and we agree, that in order to avoid any confusion that we regard him as the broker's representative and direct all of our communication to him with regard to the acquisition."

Neither Mr. Barbre nor any representative of TEC objected to, or under the evidence, responded to this letter. This fact becomes salient in analyzing the events beyond October 15, 1971 when the final option expired. On October 16, 1971 Nuclear advised Browning by letter that Nuclear was unable to exercise the option and that it had expired. Under the evidence, this was notice to TEC.

Although TEC did not follow upon the property, Nuclear did. On November 5, 1971 Nuclear advised Browning that it might enter into an agreement for the sale of the coal property. The letter recites potential terms which, in fact, were never realized. A portion of this letter is presented as written:

"Notwithstanding the termination of Nuclear's obligation to pay commissions, you, individually, have rendered valuable service to Nuclear as a geologist gathering information for presentation of the properties to lending institutions, etc. and your representation to Nuclear concerning the transaction have in all instances been justified by the facts. I have, therefore, been authorized by the Executive Committee of Nuclear's Board of Directors to state to you that in the event Nuclear is able to obtain a contract for the purchase of P & W's prestonburg [sic] coal operations and is further able to close the same in accordance with its terms and extensions of time which may be granted in connection therewith, Nuclear will pay to you the sum of $100,000.00 upon closing."

The following day, November 6, 1971, Nuclear amended its proposition after telephone conversations between Nuclear and Iley Browning by letter which, in part, stated:

"In the event that you may be required by legal action or otherwise to distribute any portion of the fee stated in my letter to you of November 5, 1971, in excess of the sum of $25,000 to any of the persons subject to Nuclear's commission letter of September 3, 1971, Nuclear will contribute a sufficient sum, up to $25,000, so that the net fee to you will be in the amount of $75,000."

A contract for the sale of the coal properties was entered into on November 8, 1971 providing for a total purchase price of $2,850,000 payable $2,200,000 in cash and 250,000 shares of Nuclear's ten cent par value stock, then trading for $5.50 a share. The consideration was payable upon closing and in the event of a default, the property owners were to keep 10,000 shares of Nuclear's stock. Nuclear consummated the purchase at 10:00 P.M., December 30, 1971; the terminal contract date was on or before noon of December 31, 1971.

■ The plaintiffs' theory that the defendant Nuclear manifested a conscious effort to deal around the contractual obligation to pay brokers' commissions is premised upon the time frame starting with the expiration of the Nuclear option on October 15, 1971 and ending with the date of the purchase contract of November 8, 1971. Plaintiffs urge the inference is bolstered by Nuclear's letters to Browning of November 5 and 6, 1971. In assessing the evidence with respect to the claim of bad faith, it is necessary to consider the applicable law of Kentucky.

■ The rule in Kentucky pertaining to the duty owed a broker by a buyer under an agreement specific in its terms, *Bass v. Foster,* Ky., 476 S.W.2d

181, 182–183 (1972), is derived from the requirement that an agent and his principal act in good faith. *Crabtree v. Board of Trustees of Immanuel Baptist Church*, Ky., 512 S.W.2d 311, 313 (1974). The Kentucky view on good and bad faith was clearly announced in *Warfield Natural Gas Co. v. Allen*, 248 Ky. 646, 59 S.W.2d 534 (1933), and has been accepted without substantial modification since that time. *Taylor v. Citizens Bank of Albany*, 290 Ky. 149, 160 S.W.2d 639 (1942); *Kramer v. Mobley*, 309 Ky. 143, 216 S.W.2d 930 (1949); *Harrod v. Meridian Mutual Ins. Co.*, Ky., 389 S.W.2d 74 (1965); *Harvin v. U. S. Fidelity & Guaranty Co.*, Ky., 428 S.W.2d 213 (1968). In the *Warfield Natural Gas Co.* decision, the Kentucky Court of Appeals noted:

> "There seems to be but little difference between 'bad faith' and 'fraud' in this particular relation (the essential state of mind of the party charged with dealing in bad faith) . . . in respect to the situation or operations or results to his damage or loss and to the . . . (principal's) advantage or gain." 59 S.W.2d at 538.

The test to be applied is two fold: first, evidence is required as to the defendant's state of mind, to be inferred by conduct, and, secondly, the transaction must be disadvantageous to one and advantageous to another. Thus, the test has been expressed as knowingly committing a breach of duty, *Fidelity & Deposit Co. of Maryland v. Citizens Bank of Somerset*, 290 Ky. 306, 161 S.W.2d 62, 66 (1942), as a question of active or positive fraud, *Kramer v. Mobley, supra*, 216 S.W.2d at 934, or a conscious doing of wrong or something that partakes of the nature of fraud, *Harrod v. Meridian Mutual Ins. Co., supra* at 76. The quality of proof required to establish bad faith where it is equated with fraud is by clear and convincing evidence. *Combs v. Salyer*, 29 Ky. 592, 165 S.W.2d 40, 44 (1942). No such evidence may be gleaned from this record.

The uncontroverted evidence of record is to the effect that Nuclear made a diligent attempt to secure the financing necessary to exercise the option of September 9, 1971 but were unable to make the necessary arrangements. That fact was communicated to Browning, who by lack of objection, stood as the representative of TEC. TEC made no further effort to assist Nuclear in consummating the purchase of the properties. Nuclear, on the other hand, attempted to secure an extension of the option. Under the terms of the November 8, 1971 purchase contract, which were so dissimilar to those of the September 9, 1971 option that not even the slightest inference of bad faith evolves, Nuclear, in effect, pledged 10,000 shares of stock in what constituted an option to purchase. The plaintiffs' suggestion that Nuclear manifested a conscious effort to deal around the obligation to pay brokers' fees is predicated solely upon Nuclear's letters to Browning dated November 5 and 6, 1971. During the course of the trial, Nuclear's witnesses testified that Browning had rendered services beyond those of a broker such as by expediting engineering work and by use of his "influence". If an inference of an impropriety arises from Nuclear's letters to Browning, it has been sufficiently rebutted and cannot be deemed to be clear and convincing evidence of an intent on Nuclear's part to deal around TEC so as to circumvent their right to a commission. Considering all of the evidence, I cannot find this crucial element to have been proved even by a preponderance of the evidence. Under applicable Kentucky law, having failed to establish the element of bad faith, plaintiffs cannot prevail on the merits. Judgment shall be entered for the defendants.

An order in conformity with this Memorandum Opinion shall this date be entered herein directing the Clerk of this Court to enter a judgment in favor of the defendant.